**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Williston Hunter ND, LLC and<br>Magnum Hunter Resources<br>Corporation, | ) <br> ) <br> ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| Plaintiffs, | ) | **MOTION TO STAY PENDING** |
| | ) | **COMPLETION OF ARBITRATION** |
| | ) | |
| | ) | Case No. 4:11-cv-066 |
| vs. | ) | |
| | ) | |
| Eagle Operating, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| Eagle Operating, Inc., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter-Defendant | ) | |
| | ) | **ORDER GRANTING PLAINTIFF'S** |
| | ) | **MOTION TO STAY COUNTERCLAIMS** |
| vs. | ) | **PENDING COMPLETION OF** |
| | ) | **ARBITRATION** |
| | ) | |
| Williston Hunter ND, LLC and | ) | Case No. 4:11-cv-067 |
| Magnum Hunter Resources | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants and | ) | |
| Counter-Claimants, | ) | |

_____

Before the Court are two motions filed by Eagle Operating, Inc. ("Eagle Operating") in the

above-captioned cases.  On September 12, 2011, Eagle Operating filed a "Motion to Dismiss, or in

the Alternative Stay Pending Completion of Arbitration" in Williston Hunter ND, LLC v. Eagle

Operating, Inc., Case No. 4:11-cv-066.  See Docket No. 6.  On October 4, 2011, Eagle Operating

filed a "Motion to Dismiss, or in the Alternative Stay Counterclaims Pending Completion of Arbitration" in <u>Eagle Operating, Inc. v. Williston Hunter ND, LLC</u>, Case No. 4:11-cv-067.  <u>See</u> Docket No. 4.  Williston Hunter ND, LLC and Magnum Hunter Resources Corporation filed a response in opposition to the motions on October 4, 2011, and October 27, 2011, respectively.  <u>See</u> Case No. 4:11-cv-066, Docket No. 13; Case No. 4:11-cv-067, Docket No. 9.  Eagle Operating filed reply briefs on October 17, 2011, and November 7, 2011.  <u>See</u> Case No. 4:11-cv-066, Docket No. 16; Case No. 4:11-cv-067, Docket No. 10.  A hearing was held on January 6, 2012.  For the reasons set forth below, the Court grants Eagle Operating's separate motions to stay all claims pending the completion of arbitration.

## I.     <u>BACKGROUND</u>

Eagle Operating is a corporation formed under the laws of the State of North Dakota, with its principal office in Kenmare, North Dakota.  Williston Hunter ND ("Williston Hunter") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Denver, Colorado.  Magnum Hunter Resources Corporation ("Magnum Hunter") is a corporation formed under the laws of the State of Delaware, with its principal place of business in Houston, Texas.  Magnum Hunter is the parent company of Williston Hunter.  The Court will refer to these two entities collectively as "Magnum Hunter."

In December 2006, Magnum Hunter purchased an undivided 50% of Eagle Operating's right, title, and interest in certain oil and gas properties in the Williston Basin of western North Dakota for the sum of $10 million cash and $10 million of Magnum Hunter's common stock.  In January

2007, Magnum Hunter and Eagle Operating also entered into a joint venture for the development and recovery of oil and gas.

A dispute arose between the parties and on April 21, 2010, Magnum Hunter filed a complaint against Eagle Operating. See Magnum Hunter Resources Corporation v. Eagle Operating, Inc., Case No. 4:10-cv-0030, Docket No. 1. Magnum Hunter alleged that the joint venture contract required both parties' consent to drill wells, and that Eagle Operating breached the contract when it completed one oil well and began drilling another in the East Flaxton Madison Unit ("EFMU") of the Williston Basin without Magnum Hunter's consent. On April 21, 2010, Magnum Hunter moved for a temporary restraining order to stop Eagle Operating's further development of wells in the EFMU. See Docket No. 3. On April 28, 2010, the Court granted the temporary restraining order. See Docket No. 5. On May 5, 2010, Magnum Hunter and Eagle Operating stipulated to amending the temporary restraining order to a preliminary injunction. See Docket No. 14. The Court then issued an order for a preliminary injunction. See Docket No. 15.

Thereafter, the parties participated in an informal dispute resolution process. On August 4, 2011, the parties reached a settlement of the lawsuit and, as part of the settlement, the parties entered into a Purchase and Sale Agreement. See Case No. 4:11-cv-066, Docket No. 8-1. Under the Purchase and Sale Agreement, Magnum Hunter, through Williston Hunter, agreed to purchase Eagle Operating's interest in certain properties for $55 million in cash ("cash consideration") and $2 million in Magnum Hunter's common stock. In addition, Eagle Operating agreed to release Magnum Hunter from all claims and liability related to the EFMU wells, which included "any cost or expense related thereto." See Docket No. 15, p. 61.

The Purchase and Sale Agreement contained a provision that allowed the purchase price to be adjusted before the closing of the settlement.  The sale of the properties was effective on April 1, 2011, but the closing of the transaction was to occur on April 18, 2011.  <u>See</u> Case No. 4:11-cv-066, Docket No. 8-1, pp. 10, 27.  Due to the delay between the effective date of the sale and closing, the agreement provides for an adjustment of the cash consideration to account for certain expenses and income derived from oil production activity.  <u>See</u> Docket No. 8-1, pp. 22-23.  Eagle Operating was required to prepare and deliver, three days prior to the closing, a description of proposed adjustments to the cash consideration, referred to as the "Preliminary Settlement Statement".  <u>See</u> Docket No. 8-1, p. 24.  The record reveals that on August 15, 2011, Eagle Operating delivered the Preliminary Settlement Statement to Magnum Hunter which proposed an upward adjustment of approximately $6 million.  <u>See</u> Docket Nos. 8 and 8-2.  In the adjustment, Eagle Operating included unpaid expenses related to the drilling of oil wells in the EFMU in the amount of $5.9 million.  <u>See</u> Docket No. 8-2.

On August 17, 2011, Magnum Hunter sent an objection to Eagle Operating.  <u>See</u> Case No. 4:11-cv-066, Docket No. 8-3.  Magnum Hunter claimed that Eagle Operating had agreed to release it from paying expenses related to the EFMU wells and, therefore, breached the Purchase and Sale Agreement when it included the EFMU expenses in the Preliminary Settlement Statement.  <u>See</u> Docket Nos. 8-3; 8-4; and 15, p. 61.  The parties failed to close the sale.

The parties then initiated the above-entitled lawsuits against each other.  On August 19, 2011, Magnum Hunter filed a complaint in federal court alleging that (1) Eagle Operating agreed to release Magnum Hunter from all claims, including expenses and costs, related to the EFMU wells and (2) Eagle Operating breached the Purchase and Sale Agreement when it included expenses of

$5.9 million related to the EFMU wells in the Preliminary Settlement Statement.  See Case No. 4:11-cv-066, Docket No. 1.  Magnum Hunter also asserted that Eagle Operating acted in bad faith and intentionally breached the contract when it included the EFMU well expenses in the settlement documents.

On August 19, 2011, Eagle Operating filed a complaint and alleged that Magnum Hunter breached the Purchase and Sale Agreement because they did not transfer the cash consideration necessary to close the transaction.  See Case No. 4:11-cv-067, Docket No. 1.  Eagle Operating contends that the Purchase and Sale Agreement required the parties to close the sale even if there was a dispute concerning any proposed adjustments to the cash consideration.  On September 13, 2011, Magnum Hunter filed an "Original Answer, Affirmative Defenses and Counterclaims" in which it re-alleged that Eagle Operating breached the settlement agreement when Eagle Operating included expenses related to the EFMU wells in the Preliminary Settlement Statement.  See Docket No. 3.

On September 12, 2011, Eagle Operating filed a motion to dismiss, or in the alternative, stay the claims alleged pending arbitration.  See Case No. 4:11-cv-066, Docket No. 6.  On October 3, 2011, Eagle Operating also filed a motion to dismiss, or in the alternative, stay the counterclaims filed by Magnum Hunter pending the completion of arbitration.  See Case No. 4:11-cv-067, Docket No. 4.  Eagle Operating contends that Magnum Hunter's claims as to the EFMU wells expenses are subject to an arbitration clause in the Purchase and Sale Agreement.

II.   **LEGAL DISCUSSION**

The Federal Arbitration Act requires district courts to grant motions to compel arbitration and stay any suit or proceeding if a valid arbitration clause exists which encompasses the dispute between the parties.  9 U.S.C. §§ 1-16.  "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  Newspaper Guild of St. Louis, Local 36047, TNG-CWA v. St. Louis Post Dispatch, LLC, 641 F.3d 263, 266 (8th Cir. 2011) (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)).  The Eighth Circuit Court of Appeals has explained that "when deciding whether to compel arbitration, a court asks whether a valid agreement to arbitrate exists, and if so, whether the dispute falls within the scope of that agreement."  Id. (citing United Steelworkers of Am. v. Duluth Clinic, Ltd., 413 F.3d 786, 788 (8th Cir. 2005)).

The parties do not dispute the existence of a valid arbitration clause contained within the terms of the Purchase and Sale Agreement.  Instead, the parties dispute whether Magnum Hunter's claims fall within the scope of the arbitration clause.  As described above, Magnum Hunter alleges that Eagle Operating improperly attempted to increase the purchase price by approximately $5.9 million when it included expenses related to the drilling of the EFMU wells in the Preliminary Settlement Statement.  Under the Purchase and Sale Agreement, if a dispute arose regarding a proposed adjustment to the cash consideration, a process to remedy the disagreement is set forth in Sections 2.5(d), 2.5(f), and 2.5(g) of the Purchase and Sale Agreement.

Section 2.5(d) of the Purchase and Sale Agreement provides, in pertinent part:

> Buyer and Seller shall use commercially reasonable efforts to resolve any such dispute prior to Closing; *provided* that any and all amounts so disputed or other adjustments claimed by any Party and not resolved by mutual agreement of Buyer and Seller prior to Closing shall be resolved in accordance with Section 2.5(f) and

the Closing shall occur with payment of the Cash Consideration as set forth in the Preliminary Settlement Statement, provided, however, Title Defects shall be addressed as set forth in Section 2.4(b)(iv).

See Case No. 4:11-cv-066, Docket No. 8-1, p. 24 (emphasis in original). Section 2.5(d) requires the parties to use commercially reasonable efforts to resolve any disputes regarding any proposed adjustments in the Preliminary Settlement Statement. Section 2.5(d) provides that Magnum Hunter must pay the cash consideration as set forth in the Preliminary Settlement Statement even if the parties do not resolve a dispute prior to the closing date. Disputes over the adjustments that are not resolved prior to closing, must be resolved after closing in accordance with Section 2.5(f).

Section 2.5(f) of the Purchase and Sale Agreement provides:

On or before the ninetieth (90th) day after the Closing, Seller shall prepare and deliver to Buyer in accordance with this Agreement, a statement (the "*Final Settlement Statement*") setting forth Seller's calculation of the final adjustments and showing the calculation of such adjustments, together with all reasonable supporting documentation. Within thirty (30) days after receipt of the Final Settlement Statement, Buyer shall deliver to Seller a written report containing any changes that Buyer proposes be made to the Final Settlement Statement and the reasons for those changes ("*Objection Report*"). The Parties shall attempt to agree to the amounts due pursuant to such adjustments, including any amounts disputed under Section 2.5(d), no later than ninety (90) days after Buyer's receipt of the Final Settlement Statement. The date upon which such agreement is reached shall be herein call the "*Final Settlement Date*". Within five (5) Business Days from the Final Settlement Date, the Party owning any amount for additional adjustments shall pay such amount, in immediately available funds by wire transfer to an account designated in writing by the other Party.

See Case No. 4:11-cv-066, Docket No. 8-1, pp. 24-25 (emphasis in original). Therefore, within ninety (90) days of the closing date, Eagle Operating is required to deliver to Magnum Hunter the Final Settlement Statement which sets forth the final proposed adjustments to the cash consideration. Magnum Hunter then has an opportunity to object to Eagle Operating's calculations and adjustments

and may propose any changes.  If the parties cannot agree on the final adjustment amount, Section

2.5(g) provides for binding alternative dispute resolution.

Section 2.5(g) of the Purchase and Sale Agreement states as follows:

If the Seller and Buyer are unable to agree upon any amounts (the "***Disputed Amounts***") in the Final Settlement Statement by the ninetieth (90th) day after Buyer's receipt of the same, Eide Bailly LLP (or if such firm within the previous 5 years has had a business relationship with one of the Parties or is unable or unwilling to act, PricewaterhouseCoopers LLP shall be selected and used) (the "***Referral Firm***") shall review such Disputed Amounts in Seller's Final Settlement Statement and Buyer's Objection Report and the Records relating to the Disputed Amounts and determine the final adjustments with respect thereto, other than adjustment determined under the mechanism regarding Title Defect set forth in Exhibit A; provided further that each Party agrees that in no event shall the Referral Firm be a firm that has had a business relationship with one of the Parties within 5 years.  With respect to any Disputed Amounts under this Agreement to be resolved by the Referral Firm, neither the Referral Firm nor any person employed by the Referral Firm will interpret the provisions of this Agreement unless otherwise agreed by Seller and Buyer.  **With respect to any Disputed Amounts for which interpretation of this Agreement is required, and for which Buyer and Seller cannot agree on such interpretation, such matter shall be submitted to arbitration in a similar manner as set forth in Exhibit A Section 8 regarding Title Defect dispute and the Referral Firm shall decide all other matters specified in this Section 2.5(f).**  The decision of the Referral Firm shall be binding on Buyer and Seller, and the fees and expenses of the Referral Firm shall be borne one-half (½) each by Buyer and Seller.  The Referral Firm shall deliver its final calculation of the Disputed Amounts in writing to Buyer and Seller as soon as is practicable, and the Party owing any amount for additional adjustments as a result thereof shall pay such amount (plus interest accrued on such amount from the Closing Date until the date such amount is paid calculated at the Prime Rate) no later than the fifth (5th) Business Day following the paying Party's receipt from the Referral Firm of the final adjustments.

See Case No. 4:11-cv-066, Docket No. 8-1, p. 25 (bold emphasis without italics added).  Thus, under

Section 2.5(g), if the parties are unable to agree to any disputed amounts, or if they are unable to

agree to any final adjustments to the cash consideration, the parties must either (a) submit the matter

to a neutral accounting firm, or (b) submit the matter to binding arbitration if the dispute requires an interpretation of the Purchase and Sale Agreement.[1]

The claims presented by Magnum Hunter concern an adjustment to the purchase price proposed by Eagle Operating. Magnum Hunter alleges that Eagle Operating included an improper adjustment in the Preliminary Settlement Statement prior to the closing date. The parties were unable resolve this dispute prior to closing. Section 2.5(g) of the Purchase and Sale Agreement specifically provides that, if the parties fail to resolve their differences by mutual agreement, the dispute must be resolved by either (a) an accounting firm, or (b) an arbitrator if the dispute requires the interpretation of the Purchase and Sale Agreement. See Case No. 4:11-cv-066, Docket No. 8, p 25 (emphasis in original). Under the terms of the agreement, the dispute between the parties must be submitted to an arbitrator because Magnum Hunter contends that the Purchase and Sale Agreement does not authorize Eagle Operating to include the EFMU expenses in the adjustments to the cash consideration, and the dispute requires interpretation of the agreement. In other words, the parties have differing interpretations of the agreement as to whether the costs associated with the EFMU wells ($5.9 million) is a proper adjustment to the cash consideration. If the parties cannot agree on the final adjustment amounts, Section 2.5(g) provides that the matter be submitted to arbitration.

Magnum Hunter argues that the arbitration clause in Section 2.5(g) of the Purchase and Sale Agreement is "narrow" and only includes disputes as to amounts and not the types of adjustments

---

[1] The provisions of Section 2.5 of the Purchase and Sale Agreement are an open invitation to litigation. Given the history of this litigation, there was a strong likelihood that the parties would be unable to agree to the disputed amounts, the final adjustments to the purchase price, and/or would have differing interpretations of the agreement. Although the $5.9 million cost associated with the EFMU wells was at the heart of this dispute and the cause of the original lawsuit in 2010, this elephant in the room was never clearly and explicitly addressed in the agreement.

to the cash consideration, citing <u>Twin City Monorail, Inc. v. Robbins & Meyers, Inc.</u>, 728 F.2d 1069 (8th Cir. 1984).  In that case, Robbins & Myers agreed to sell a division of its company to Twin City Monorail.  The purchase agreement estimated the final sale price would be $1.25 million, but the actual price would be determined by the "book value" of the inventory on hand at the time of closing.  A provision within the agreement stated that the "buyer shall have the right to . . . object in writing to any *item* contained in the Statement of Inventory . . . and any such objection which is . . . unresolved . . . shall be promptly submitted for resolution to an independent certified public accountant."  <u>Id.</u> at 1073 (emphasis and ellipses in original).  The parties did not dispute the physical count of the inventory but rather disagreed over the accounting method of valuing the inventory. The Eighth Circuit found the dispute over the accounting method was outside of scope of the "narrow" arbitration clause regarding items in the inventory.  <u>Id.</u> at 1073-74.

The provisions in the Purchase and Sale Agreement at issue in this protracted dispute are distinct from those discussed in <u>Twin City Monorail</u>, 728 F.2d 1069.  In <u>Twin City Monorail</u>, the Eighth Circuit found that the location of the arbitration clause - found within the same paragraph that concerned the physical count of the inventory and not the paragraph that discussed the book value - was persuasive support for the conclusion that the dispute over the accounting method of valuing the inventory fell outside the arbitration clause.  <u>Id.</u> at 1074.  Unlike the scenario presented in <u>Twin City Monorail</u>, Section 2.5 of the Purchase and Sale Agreement in this case, which contains the arbitration clause, contains broad language to describe how disputes over proposed adjustments to the purchase price will be handled.  Section 2.5(d) provides, in pertinent part:

> **Buyer and Seller shall use commercially reasonable efforts to resolve any such dispute prior to Closing; *provided* that any and all amounts so disputed or other adjustments claimed by any Party and not resolved by mutual agreement of**

> **Buyer and Seller prior to Closing shall be resolved in accordance with Section 2.5(f)** . . . .

See Case No. 4:11-cv-066, Docket No. 8-1, p. 24 (bold emphasis added).  Section 2.5(d) is a very broad provision in the agreement which discusses disputes over not just "any and all amounts" but also disputes concerning "other adjustments claimed by any Party."  The agreement is clear in that such disputes must be resolved pursuant to Section 2.5(f) if the parties fail to resolve them before closing.  Section 2.5(f) requires that Eagle Operating submit a Final Settlement Statement and then permit Magnum Hunter to deliver "a written report containing **any changes that Buyer proposes be made to the Final Settlement Statement** and the reasons for those changes" (an Objection Report).  See Docket No. 8-1, pp. 24-25 (emphasis added).  In other words, the agreement permits Magnum Hunter to propose "any changes" to the Final Settlement Statement, not merely changes to the amounts of the adjustment.  The location of the arbitration clause within these provisions supports the conclusion that Magnum Hunter's claims regarding the types and amounts of cost adjustments to the purchase price are subject to the broad arbitration clause.[2]

The Eighth Circuit explained in Twin City Monorail that "a significant factor supporting our conclusion is the use of the word 'item' in the arbitration clause, which connotes materiality in the physical sense and militates against the inclusion of the accounting method as an arbitrable issue."  Id. at 1073-74.  Magnum Hunter contends that the phrase "Disputed Amounts" found in Section 2.5(g) should be similarly construed to preclude disputes over the types of adjustments to be allowed.  However, neither the language in the Purchase and Sale Agreement, nor the common

---

[2]  As previously noted, there was a strong likelihood that the parties would disagree on the disputed amounts, the final adjustments to the purchase price, and/or would have differing interpretations of the Purchase and Sale Agreement.  It also appears that Eagle Operating chose to take advantage of that strong likelihood and used the broad arbitration clause as leverage in an attempt to recover the costs associated with the drilling of the EFMU wells.

meaning of the term "amount," supports Magnum Hunter's argument.  Section 2.5 of the Purchase and Sale Agreement (where the arbitration clause is located) contains broad language referring to disputes regarding "any and all amounts so disputed" along with "other adjustments claimed by any Party" and permits Magnum Hunter to propose "any changes" to the final adjustment in the purchase price.  See Case No. 4:11-cv-066, Docket No. 8-1, pp. 24-25.  Section 2.5(g) further provides that "[i]f the Seller and Buyer are unable to agree upon any amounts (the "**_Disputed Amounts_**") in the Final Settlement Statement" either an accounting firm or an arbitrator must resolve the dispute.  See Docket No. 8-1, p. 25 (emphasis in original).  In the context of the Purchase and Sale Agreement, the phrase "Disputed Amounts" appears to be a reference to the unresolved disputes discussed in the previous subsections of Section 2.5.  Magnum Hunter's contention that "Disputed Amounts" should be construed to preclude any disputes regarding the types of adjustments allowed is not supported by the  terms and conditions of the Purchase and Sale Agreement.

In addition, the common definition of "amount" does not support Magnum Hunter's argument.  The American Heritage Dictionary defines "amount" as "[t]he total of two or more quantities; aggregate. . . .  A number; sum."  The American Heritage Dictionary 103 (2nd College ed. 1985).  The Oxford English Dictionary provides that "amount" means  "1.  The sum total to which anything mounts up or reaches: a. in quantity.  b. in number. . . .  3.  A quantity or sum viewed as a total. . . ."  Oxford English Dictionary (2nd. ed. 1989) (online version December 2011, http://www.oed.com/view/Entry/6575; last visited January 2, 2011).  Considering these common definitions, the phrase "Disputed Amounts" does not preclude a dispute over the types of adjustments allowed because including or excluding a type of adjustment, such as the EFMU expenses, would affect the sum total or full value of the cash consideration adjustment.  A dispute

regarding the EFMU expenses logically leads to a "Disputed Amount." In contrast to the reasonable distinction drawn by the Eighth Circuit in Twin City Monorail between the term "item" and a method of accounting, Magnum Hunter proposes an interpretation of the phrase "Disputed Amounts" that is neither supported by the Purchase and Sale Agreement nor the plain meaning of the term "amount."

It is well-established in the Eighth Circuit Court Appeals that arbitration clauses should be liberally construed by resolving any doubts in favor of arbitration. 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1198-99 (8th Cir. 2008) (citing Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983)) (explaining Congress created liberal federal policy favoring arbitration). A motion to compel arbitration should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Simmons Foods, Inc. v. H. Mahmood J. Al-Bunia & Sons Co., 634 F.3d 466, 468-69 (8th Cir. 2011) (quoting Lyster v. Ryan's Family Steak Houses, Inc., 239 F.3d 943, 945 (8th Cir. 2001)). The broad language of Section 2.5 of the Purchase and Sale Agreement demonstrates that the arbitration clause in Section 2.5(g) covers disputes concerning the types and amounts of adjustments to be made to close the transaction. The Court concludes that pursuant to Section 2.5(g), Magnum Hunter's claim that Eagle Operating improperly included certain expenses related to the EFMU wells in the Preliminary Settlement Statement must be submitted to arbitration. The Court grants Eagle Operating's motions to stay all claims pending the conclusion of arbitration.

III.    **CONCLUSION**

The Court has carefully reviewed the entire record, including the Purchase and Sale Agreement and relevant case law from the Eighth Circuit Court of Appeals. The Court finds that Magnum Hunter Resources and Williston Hunter's claims and counterclaims as they relate to disputed amounts, cost adjustments to the purchase price, <u>and</u> disputes as to the interpretation the agreement concerning such matters, are subject to the broad arbitration clause contained within Section 2.5 of the Purchase and Sale Agreement. The Court **GRANTS** Eagle Operating's motions (Case No. 4:11-cv-066, Docket No. 6; Case No. 4:11-cv-067, Docket No. 4), **ORDERS** the parties into arbitration to resolve all disputes related to any disputed amounts, cost adjustments to the cash consideration, or any other disputes as to the interpretation of the agreement, and **STAYS** Magnum Hunter and Williston Hunter's claims and counterclaims (Case No. 4:11-cv-066, Docket No. 1; Case No. 4:11-cv-067, Docket No. 3) pending the completion of arbitration.

**IT IS SO ORDERED**.

Dated this 24th day of January , 2012.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

14